UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
GENNARO VITERITTI,

                    Plaintiff,

      -against-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                  Defendant.
----------------------------------------------------X

**MEMORANDUM & ORDER**

Civil Action No. 14-6760 (DRH)

**APPEARANCES:**

**SULLIVAN & KEHOE, LLP**
Attorneys for Plaintiff
44 Main Street
Kings Park, NY 11754
By: Alexandra K. Michalowicz, Esq.

**ROBERT L. CAPERS**
**UNITED STATES ATTORNEY, EASTERN DISTRICT OF NEW YORK**
Attorney for Defendant
271-A Cadman Plaza East
Brooklyn, New York 11201
By: Vincent Lipari, AUSA

**HURLEY, Senior District Judge:**

       Plaintiff Gennaro Viteritti ("plaintiff" or "Viteritti") commenced this action pursuant to

42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social

Security (the "Commissioner" or "defendant") which denied his claim for disability benefits.

Presently before the Court is defendant's motion and plaintiff's cross-motion for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c).  For the reasons discussed

below, defendant's motion is granted and plaintiff's motion is denied.

**BACKGROUND**

## I.    Procedural History

Plaintiff filed a claim for disability insurance benefits on May 11, 2012, alleging

disability as of October 11, 2011 due to auto immune deficiency syndrome, depression, anxiety,

congestive obstructive pulmonary disease, a heart murmur, kidney stones and hernia. The claim

was denied and plaintiff requested a hearing. (Tr. 99-100, 118, 121.)[1] A hearing was held on June

11, 2013 before administrative law judge ("ALJ") Bruce MacDougall; plaintiff appeared with

counsel and testified. (Tr. 30-47.) By Notice of Decision-Unfavorable, dated June 26, 2013, ALJ

MacDougall denied plaintiff's claim. (Tr. 11-25.) This decision became the final decision of the

Commissioner on September 24, 2014, when the Appeals Council denied plaintiff's request for

review. (Tr. 1-5.) This action followed.

## II.    Factual Background

### A.  Non-Medical Evidence

Plaintiff was born in March 1966 and completed eleventh grade. Tr. 122. From 1996 until

October 2011, when he last worked, he was head of housekeeping maintenance at a hotel night

club. He also worked as a freelance hair stylist. His housekeeping job required him to clean

rooms "non-stop" as well as order supplies, train staff, and prepare schedules. Tr. 35. He would

regularly lift about 30 to forty pounds and stated he walked and stood eight hours a day, sat zero

hours a day, and climbed, handled large objects, wrote or typed and reached eight hours a day.

---

[1] References to "Tr." are to the Administrative Record filed in this case.

Tr. 123.

At the hearing before the ALJ, plaintiff testified that he stopped working because it was "too much pressure' and that he "flipped out." Tr. 35, 37. He attributed this breakdown to bipolar disorder and ADHD. Tr. 37. Plaintiff has AIDS and complains of muscle weakness. Tr. 38, 40. He says his medications make him a "little batty." Tr. 38. Although he has been on these medications for sixteen years, he maintains that the side effects have worsened over time. Tr. 39. He reported having a hard time functioning day in and out and that activities such as shopping are highly stressful. He testified he does not visit with friends or family and that he's so depressed he does not want to do anything. Tr. 39-42. He stated he suffers from panic attacks once or twice a day, even when he is not working, and that they last for about 30 minutes. Tr. 45. Since his onset date, he has worked 4 hours a day, 4 days per week as a cashier for Pathmark at $7.50 an hour but experiences difficulty interacting with customers and working with numbers. Tr. 36, 44. He testified that his ADHD and bipolar are "hit or miss," preventing him from working full time; the doctors are still trying to get his medications "right." Tr. 37. Plaintiff further stated that he has a difficult time functioning day-to-day; it takes "a lot out of [him]" to do laundry, cook, and clean his house. Tr. 41. He listed television and reading among his hobbies. Tr. 42.

In a June 2012 Function Report, plaintiff stated that he lived by himself and had no problems with his personal care (except that he cannot shower although he can bathe) and did not need any special help to care for his personal needs or take his medications. He cleaned and did laundry once every two weeks and prepares healthy meals one day per week. Tr. 130-33. He

reported that he could not walk for more than one block before needing to rest for 5-10 minutes. Tr. 140. Although he does not go outside often, he interacts with others on the computer and he drives to go food shopping once per week. Tr. 133-34. While he stated that manic episodes hinder his ability to handle money, he can count change and pay bills. Tr. 134.

### B. Medical Evidence - Treating Sources

### Stony Brook University Hospital and Medical Center, Dr. Jack Fuhrer and Nurse Practitioner Linda Ording-Bauer

Plaintiff saw Dr. Jack Fuhrer, an infectious disease specialist, at Stony Brook University Medical Center from 2005 to March of 2013. Tr. 427. In his report dated April 21, 2011, Dr. Fuhrer noted that plaintiff suffered from AIDS, diabetes and chest pains. Tr. 323. He noted that plaintiff had the flu for three to four months and although EKG's showed no immediate threat, plaintiff had multiple risk factors for coronary artery disease. Tr. 312. On February 23, 2012 plaintiff expressed concern to Dr. Fuhrer over his inability to build muscle mass despite working out with a trainer for five months. Tr. 318. Dr. Fuhrer assured plaintiff that he was not experiencing muscle wasting and there was no evidence of muscle tenderness, swelling or atrophy; plaintiff had good muscle strength and tone bilaterally. Tr. 319.

On May 24, 2012, Linda Ording-Bauer, a Nurse Practitioner (NP) in the Stony Brook Medical Center's Division of Infectious Disease completed a "Medical Report on Adult With Allegation of Human Immunodeficiency Disease (HIV) Infection." Tr. 254-256. She noted that plaintiff did not suffer from HIV Wasting Syndrome, possessed no neurological abnormalities associated with the HIV, and had no signs of cardiomyopathy or nephropathy. Tr. 255. She did, however, note that plaintiff experienced other "repeated manifestations of HIV infection"

including anxiety and depression, anal rectal dysplasia, HPV, nephrolithiasis, myositis, insomnia, and hyperlipidemia. Tr. 256. These manifestations, according to NP Ording-Bauer, result in a "marked limitation in maintaining social functioning" as well as "marked limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." Tr. 256.

Dr. Fuhrer filled out a medical questionnaire for New York State Office of Temporary and Disability Assistance's Division of Disability Determinations dated June 21, 2012. Tr. 309-315. In this survey, Dr. Fuhrer indicated that he treats plaintiff for AIDS, myositis, and hyperlipidemia while other physicians treat plaintiff for nephrolithiasis, anxiety, and anal rectal dysplasia. Tr. 309. He noted that plaintiff's HIV viral load was undetectable, attaching lab results to the questionnaire. Tr. 309. He further stated that plaintiff's current symptoms were anxiety (accompanied by panic attacks), muscle weakness, and pain and fatigue. Tr. 310-12. Such fatigue and weakness limited plaintiff's ability to walk and stand, however plaintiff's sitting was not limited. Tr. 311. He noted that plaintiff had minor cognitive impairment and memory forgetfulness, though it is unclear if this stems from his HIV or anxiety. Tr. 312-13. Dr. Fuhrer opined "plaintiff cannot work in restaurant or hotel business previously employed in or as a hair stylist: Requires being on feet and standing." Tr. 314. However, Dr. Fuhrer did not specify to what extent there was a limitation on plaintiff's ability to walk and stand. Dr. Fuhrer did indicate that plaintiff experienced no limitation in social interaction and it was "unclear" to him whether plaintiff can "work at anything." Tr. 314.

In September 2012, plaintiff complained to Dr. Fuhrer of muscle weakness but the doctor

noted that the muscle biopsy was inconclusive. Tr. 423. Later that year, in December, plaintiff reported to N.P. Ording-Bauer that he felt more normal. His myalgias were greatly decreased, his anxiety and depression had improved with medication and treatment, he gained 5 pounds and his appetite had increased. Tr. 426.

On January 30, 2013, Dr. Fuhrer and NP Ording-Bauer co-authored a letter outlining plaintiff's treatment status. Tr. 427. The letter stated that the two have treated plaintiff since 2005. Tr. 427. They opined that although plaintiff is not directly disabled by his HIV, he has comorbidities that affect his overall health. Tr. 427. They concluded that he has mild to moderate cognitive impairment either stemming from his anxiety and depression, or his HIV, or both. Tr. 427.

On March 14, 2013, Dr. Fuhrer reported that plaintiff's AIDS is stable and his insomnia was responding to medication. Tr. 467. Also, Dr. Fuhrer stated that plaintiff complained of muscle weakness. Tr. 466. However, his physical was normal. Tr. 466.

### F.E.G.S - Dr. Chuang and Social Worker Ruiz

Plaintiff underwent psychiatric and therapy treatment at F.E.G.S. beginning May of 2012. Tr. 275. His stated goal of therapy was to "get mentally better and control impulsive behavior." Tr. 275. On May 10, 2012 social worker (SW) Ruiz completed an "Adult Assessment and Psychosocial", which was signed by supervisory social worker Karen Muniz on May 22, 2012. Tr. 275-86. The report indicated that plaintiff was hostile, defensive, and anxious toward the interviewer but exhibited appropriate mannerisms and grooming; further, he exhibited poor concentration, poor judgment, fair short-term memory and poor long-term memory, but good

"intellectual functioning." Tr. 276-77. SW Ruiz found that plaintiff had poor insight and poor impulse control. Tr. 278. Plaintiff indicated that he previously used alcohol extensively, and drugs on a few occasions, to relax. Tr. 278. Although plaintiff expressed that he was very interested in seeking employment, and noted he was looking for a job, he expressed concern that medical impediments would hinder his ability to work. Tr. 279-80. SW Ruiz concluded that plaintiff had moderate risk of acute psychosocial stressors and, although he had a high motivation for treatment and the potential to positively interact with staff, he displayed only moderate potential to interact positively in groups. Tr. 284. He diagnosed plaintiff with generalized anxiety disorder, ADHD, alcohol dependence and borderline personality disorder. Tr. 286. He gave plaintiff a GAF (Global Assessment of Functioning) score of 50, which connotes moderate to severe impediments in overall functioning level. Tr. 286.

On June 4, 2012, plaintiff saw Dr. Bor-Shiuan Chuang, a psychiatrist at F.E.G.S for a psychiatric evaluation. Tr. 266-274. Dr. Chuang first indicated that he perceived plaintiff's information as reliable. Tr. 266. He recognized plaintiff had a previous problem with alcohol and smoked two packs per day. Tr. 267. Dr. Chuang noted that during the interview plaintiff looked appropriate, was alert, attentive and cooperative, but was fidgety. Tr. 269. Plaintiff complained of anhedonia, helplessness, sleep disturbance, and hopelessness. Tr. 269. He also complained of racing thoughts but he had normal speech and showed no signs of a thought disorder. Tr. 270. Dr. Chuang diagnosed plaintiff with ADHD, alcohol abuse, borderline personality disorder, and bipolar disorder. Tr. 273. He also gave plaintiff a GAF score of 50 and prescribed him Abilify and Clonidine. Tr. 273.

On June 11, 2012, SW Ruiz completed a Function Report to supplement plaintiff's application for social security disability benefits. Tr. 135-142. SW Ruiz noted that plaintiff's symptoms "limit [his] ability to function effectively in a work environment." Tr. 135. He indicated that plaintiff has a difficult time completing household chores due to problems with his knees, asthma, and chronic obstructive pulmonary disease and that he has difficulty lifting pots to cook. Tr. 136-37. He also indicated that plaintiff needs encouragement to do these things. Tr. 137. He reported that plaintiff went outside two days per week, one of which was usually used for grocery shopping, and spoke with friends by phone and computer but was estranged from his family. Tr. 138-39, 141. In regards to plaintiff's abilities, SW Ruiz reported that plaintiff's knee injury, pulmonary disease and asthma affected his ability to lift, squat, bend, stand, reach, walk, kneel, talk, climb stairs, remember things, complete tasks, concentrate, understand, follow instructions and get along with others. Tr. 140. He also noted that plaintiff has a short attention span and only sometimes finishes what he starts. Tr. 140. SW Ruiz wrote that plaintiff "often misunderstands communication and becomes frustrated and irritable," has difficulty accepting change and becomes very anxious. Tr. 141. His fear of rejection also plays a role in his isolation and inability to communicate with others. Tr. 141.

On June 18, 2012, SW Ruiz completed a "Supplemental Questionnaire as to Residual Functional Capacity," intended to measure plaintiff's vocational ability using the following scale: moderate impairment - affecting although not precluding ability to function; moderate severe impairment - seriously affecting the ability to function; and severe impairment - an extreme impairment of ability to function. Tr. 257-58. SW Ruiz indicated that plaintiff had (1) moderate

severe impairments in his ability to relate to other people, perform work requiring frequent contact with others, perform repetitive tasks, and perform varied tasks, (2) severe impairment to perform complex tasks and to work in a routine work setting, and (3) moderate impairments in his ability to perform routine daily activities, comprehend and follow instructions, perform work where contact with others would be minimal, and to perform simple tasks. Tr. 257-258.

On June 27, 2012 SW Ruiz reported that plaintiff had feelings of anxiety and irritability due to an adverse reaction to psychotropic medication. Plaintiff agreed to take Guanfacine for his ADHD. Tr. 295.

On July 11, 2012 plaintiff reported not getting more than a few hours sleep each night, which hyperactivity SW Ruiz opined was attributable to anxiety rather than ADHD. Tr. 434.

On August 8, 2012, plaintiff told SW Ruiz that his anxiety had been reduced since taking a new anti-depressant medication, but indicated that he wished for more progress at a faster pace. Tr. 439. Similarly, on August 28 and September 13 respectively, SW Ruiz reported that plaintiff (1) "definitely feels better" and "more level" and cited his uncharacteristically tempered reaction to learning he had been denied Social Security Disability benefits and (2) plaintiff said he felt more "level" and liked the way he interacted with people better and appeared more stable, less moody. Tr. 444, 447. However, on September 27, 2012 plaintiff appeared "subdued" and reported that he felt unmotivated and that he was less active as he had previously been. Tr. 449. SW Ruiz noted these effects, coupled with unwanted weight gain, led plaintiff to question whether the side effects of the medication that had calmed him down were too strong. Tr. 449. Plaintiff also questioned whether feeling this way was better than his previous manic episodes.

Tr. 449.

On November 19, 2012, plaintiff reported to SW Ruiz that he was going on a job interview and that Dr. Chuang had changed his medications because he felt blasé. Tr. 457. He reported increased anxiety due to the looming end of his unemployment benefits and stated that he did not like the feeling of "not reacting to things," the latter of which prompted a medication change. Tr. 457-58. On December 18, 2012, plaintiff stated to SW Ruiz that he went for a job interview, however felt "over [his] head." Tr. 463.

Plaintiff saw Dr. Chuang on January 26, 2013 and complained that he was experiencing increased stress, especially from his new job as a cashier at Pathmark, and that the Adderall made him irritable. Tr. 502. Dr. Chuang switched plaintiff's medication to Klonopin and Concerta. Tr. 502.

SW Ruiz and Dr. Chuang completed a Medical Source Statement dated February 7, 2013 detailing their opinion of plaintiff's abilities despite his mental impairments. Tr. 419-421. For each impairment, SW Ruiz and Dr. Chuang were asked to indicate that plaintiff's limitation was either extreme (indicating an inability to sustain the activity during an eight-hour workday and connoting a complete loss of ability), marked (a substantial loss of ability; can sustain performance up to only 1/3 of an 8-hour workday), moderate ( some loss of ability but can still sustain performance for 1/3 up to 2/3 of a 8-hour workday), and none/mild (no significant loss of ability; can sustain performance for 2/3 of more of 8-hour workday). Tr. 419. SW Ruiz and Dr. Chuang indicated that plaintiff experiences extreme limitation in maintaining concentration for periods of at least two hours, sustaining a routine without special supervision, responding to

customary work pressures, responding appropriately to work setting changes, performing complex, repetitive, or varied tasks, and behaving in an emotionally stable manner. Tr. 419-20. SW Ruiz and Dr. Chuang further opined that plaintiff experiences marked limitations in relating to others, completing daily activities, understanding and carrying out instructions, responding appropriately to supervisors, and using good judgment on the job. Tr. 419-420. Finally, SW Ruiz and Dr. Chuang stated that plaintiff had moderate limitations in personal habits, ability to perform activities within a schedule, responding appropriately to co-workers, and performing simple tasks. Tr. 419-20. Dr. Chuang and SW Ruiz also indicated that plaintiff's condition is likely to worsen if placed under stress. Tr. 420. They stated that these are lifetime issues and likely to continue after twelve months and that the effects of his medication also contribute to his inability to work, citing drowsiness and that plaintiff feels "dopey" when taking them. Tr. 420. They predicted plaintiff would likely miss three to four days of work per month due to his condition. Tr. 420.

On February 7, 2013 plaintiff also complained to SW Ruiz about feeling "flat" and that he was not experiencing "highs and lows" like he had previously. Tr. 498. He worried about his performance at his job because his ADHD medication, Concerta, made him feel dull. Tr. 498. On March 18, 2013, plaintiff informed Dr. Chuang that he recently experienced a manic episode and was subsequently resumed taking Invega and Wellbutrin. Tr. 490. Dr. Chuang discontinued Concerta, however, because it made plaintiff nauseous. Tr. 490. Plaintiff reported to SW Ruiz that his manic episode had caused him to relapse with alcohol and indicated he would need to get back on medication to avoid manic episodes. Tr. 492. On April 11, 2013, after resuming

medication, SW Ruiz noted that plaintiff seemed more stable than he had in the past, though plaintiff did report heightened anxiety and uneasy sleep. Tr. 487-88. Five days later, on April 16, plaintiff complained to Dr. Chuang of racing thoughts, though noted he experienced less depression and anxiety. Tr. 485. Dr. Chuang prescribed Trazadone, an antidepressant. Tr. 485. On May 28, plaintiff told Dr. Chuang that he was experiencing depression but did not want to increase his Wellbutrin dosage. Tr. 473. Plaintiff reported he was looking for a steady job, and although he was sleeping better he still had racing thoughts. Tr. 473.

### **Huntington Medical Group**

In November and December of 2011, Plaintiff saw a dermatologist at Huntington Medical Group for fungus on his face and hand, and for genital and anal warts. Plaintiff was prescribed medication and the warts were removed. Tr. 181-84, 187-97, 214-15, 222, 224, 228, 230-33.

On January 26, 2012, plaintiff saw Dr. Edward Strogach with complaints of fatigue, difficulty passing stool, and chest pain. Tr. 195. An electrocardiogram ("EKG") was normal. Tr. 196. On February 1, 2012, plaintiff saw Dr. Strogach for complaints of right-sided chest pain not related to exertion or meals. Tr. 198, repeated at Tr. 237. Upon examination, plaintiff was fully oriented and had full strength in all the extremities. Tr. 198. A chest x-ray was normal and an EKG showed normal sinus rhythm. Tr. 199, 238. The doctor recommended that plaintiff follow a low sodium diet, stop smoking, see a pulmonologist, and obtain an echocardiogram and stress test. Tr. 199. On February 6, 2012, an EKG showed normal left ventricular function, mild mitral valve insufficiency, and mild to moderate aortic insufficiency. Tr. 206.

On February 8, 2012, plaintiff saw Dr. Aman Hourizadeh, a pulmonologist, for a

pulmonary nodule found on a CT scan. Tr. 208-09. Plaintiff denied a significant cough, wheezing, sputum production, or hemoptysis. Tr. 208. He complained of dyspenea on moderate exertion. Tr. 208. Plaintiff reported that he could walk up two flights of stairs. Tr. 208. He denied any pleuritic pain, but sought a cardiac evaluation due to substernal chest discomfort. Tr. 208. Plaintiff reported he is a chronic smoker and that he was self-employed as a residential house cleaner. Tr. 208. He listed his medications as Lipitor, Ambien, and anti-retroviral medication for HIV. Tr. 208. Dr. Hourizadeh reported that plaintiff was in no acute distress and appeared comfortable. Tr. 208. His lungs were clear to auscultation with no rales, wheezes, or rhonchi. Tr. 208. Plaintiff had an incidental finding of a subcentimeter pulmonary nodule, ground-glass in nature, in the right middle lobe (stable from 2/2/09 to 1/24/12) and atypical chest pain with a recent cardiac evaluation showing some valvular heart disease, which may be further evaluated by a CT scan of the chest. Tr. 209, repeated at Tr. 244. The doctor recommended that plaintiff obtain a pulmonary function test and stop smoking. Tr. 209.

On February 8, 2012, plaintiff also saw Dr. Raman Bhasin, a cardiologist and had a stress test. Tr. 211. The test showed no evidence of ischemia and plaintiff had no chest pain with exercise. Tr. 211. Dr. Bhasin recommended that plaintiff stop smoking and continue taking Lipitor. Tr. 211.


### C.    Consultative Medical Evidence

**Kathleen Acer, Ph.D.**

On July 24, 2012 plaintiff saw Kathleen Acer, Ph.D. for a consultative psychiatric

examination. Tr. 377-380. Plaintiff, having driven himself to the evaluation unaccompanied, told Dr. Acer that he last worked as a housekeeper in September of 2011, and quit "due to health and psychiatric reasons." Tr. 377. Plaintiff listed his medications as Guanfacine, Ziprasidone, Ambien, Reyataz, Norvir, Truvada, and ProAir and stated he experienced side effects from these medications. Tr. 377. He reported that he is HIV positive, has a heart murmur, problems with heart valves, asthma, emphysema, and kidney stone history. Tr. 377. He told Dr. Acer he has difficulty sleeping, a diminished appetite, difficulty getting out of bed, crying spells, and manic episodes, among other symptoms. Tr. 377. He also stated he recently lost twenty pounds. Tr. 377. Additionally, he complained of panic attacks, difficulty breathing, and trembling. Tr. 378.

On examination, Dr. Acer reported that plaintiff was cooperative, his speech clear, he was fully orientated and had goal directed thoughts. His mood was anxious but he was alert. Plaintiff had average intellectual functioning, fair insight and good judgment. Dr. Acer noted that plaintiff's attention and concentration seemed impaired, as he had trouble with serial 3s. His recent and remote memory skills were noted to be mildly impaired. She diagnosed bipolar disorder, ADHD, panic disorder with agoraphobia and generalized anxiety disorder. She opined that plaintiff could follow and understand simple instructions and directions and appropriately perform simple tasks. He may, however, have some trouble maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, adequately relating with others and dealing with stress. Tr. 378-79.

Dr. Acer determined plaintiff could care for his personal needs including dressing, bathing, cooking, cleaning, grocery shopping and grooming himself occasionally. Tr. 379.

**Andrea Pollack, D.O.**

Andrea Pollack, D.O. conducted  an internal consultative examination on July 24, 2012. Plaintiff complained of generalized muscle aches and fatigue. He related a history of AIDS, kidney stones, HPV, recurrent anal condylomas which required surgery due to dysplasia, inguinal hernia, asthma, emphysema, and a history of aortic valve disease. Plaintiff complained of chest pain once or twice a week, but believed it was related to his anxiety and bipolar disorder. He also alleged a history of bipolar disorder, ADHD, and anxiety diagnosed in the last year. Plaintiff reported that he cooked once a week, cleaned once a month, did laundry, cared for his personal needs, and shopped every two weeks. Tr. 381-82.

On examination, Dr. Pollack reported that plaintiff was in no acute distress. Plaintiff had an intact gait, clear lungs, and a heart murmur at the right sternal border. Plaintiff had full range of motion of his cervical and lumbar spine and his straight leg raising test was negative bilaterally; he had full range of motion of the upper extremities. He could not perform range of motion testing on the right lower extremity secondary due to a recent muscle biopsy. Plaintiff's reflexes were intact, he had no sensory deficits, no muscle atrophy, full grip strength bilaterally, and full strength in the upper and lower extremities. He had corrected vision at 20/30. Dr. Pollack opined that plaintiff was restricted in activities that require fine visual acuity of the right eye, and he should avoid heights, operating heavy machinery, activities that require heavy exertion, smoke, dust, known respiratory irritants, and activities that may put him at risk for a fall. The doctor stated that plaintiff had a moderate restriction in lifting, carrying, pushing, and pulling. Additionally, due to a recent muscle biopsy he currently had a moderate restriction in

squatting, and a mild restriction in walking, standing, and climbing stairs. Tr. 383-5.

On August 10, 2012, R. Lopez, a State agency psychological consultant, reviewed the evidence of record and opined that plaintiff had a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of deterioration. In assessing residual functional capacity, Dr. Lopez concluded that plaintiff could follow supervision, relate appropriately to coworkers, and perform substantial gainful activity. He opined that plaintiff was precluded from performing tasks requiring a high degree of stress. Tr. 400-07.

On August 16, 2012, Dr. Gowd, a State agency medical consultant, reviewed the evidence of record and opined that plaintiff could stand and/or walk six hours a day out of an eight-hour workday, occasionally lift up to 20 pounds, occasionally stoop and crouch, and had no kneeling and crawling limitations. Tr. 411.

## DISCUSSION

### I.     Standard of Review

#### A.     Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The Court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted).  "Substantial evidence is 'more than a

mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted).  Thus the only issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability benefits was "based on legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77.

> **B.**     **Eligibility for Disability Benefits**

> 1.     *The Five-Step Analysis of Disability Claims*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims.  See 20 C.F.R. § 404.1520.  This Circuit has described the procedure as

follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

2. *The "Special Technique" for Evaluation of Mental Impairments*

The SSA "has promulgated additional regulations governing the evaluation . . . of the severity of mental impairments," that should be applied "at the second and third steps of the five-step framework . . . ." *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008). This "special technique" requires "the reviewing authority to determine first whether the claimant has a medically determinable mental impairment, [and if] there is such impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph C of the regulations, which specifies four broad functional areas: (1)

18

activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id*. (internal citations omitted); *see also* 20 C.F.R. § 404.1520a(b), (c). "[I]f the degree of limitation in each of the first three areas is rated 'mild or better, and no episodes of decompensation are identified . . . the reviewing authority . . . will conclude that the claimant's mental impairment is not severe' and will deny benefits." *Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(1)). However, if claimant's mental impairment or combination of impairments is severe, "in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder," the reviewing authority must "first compare the relevant medical findings [along with] the functional limitation rating to the criteria of listed mental disorders." *Id*. (citing § 404.1520a(d)(2)). If the mental impairment is equally severe to a listed mental disorder, the "claimant will be found to be disabled." *Id*. "If not, the reviewing authority [must then] assess" plaintiff's RFC. *Id*. (citing 20 C.F.R. § 404.1520a(d)(3)).

### C. The Treating Physician Rule

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78-79. The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts." *Hallora*n, 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). When the treating physician's opinion is not given controlling

weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion. *Id*. § 404.1527(d)(2)(I-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel.

*Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685

F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("'It is

the ALJ's duty to investigate and develop the facts and develop the arguments both for and

against the granting of benefits.'") (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001)),

amended on other grounds on rehearing, 416 F.3d 101 (2d Cir. 2005).  Specifically, this duty

requires the Commissioner to "seek additional evidence or clarification" from the claimant's

treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or

their reports are "inadequate for [the Commissioner] to determine whether [claimant] is

disabled."  20 C.F.R. §§ 404.1512(e), (e)(1).  The Commissioner "may do this by requesting

copies of [the claimant's] medical source's records, a new report, or a more detailed report from

[the claimant's] medical source."  Id. § 404.1512(e)(1).  The only exception to this requirement is

where the Commissioner "know[s] from past experience that the source either cannot or will not

provide the necessary findings."  Id. § 404.1512(e)(2).  If the information obtained from the

claimant's medical sources is not sufficient to make a disability determination, or the

Commissioner is unable to seek clarification from treating sources, the Commissioner will ask

the claimant to attend one or more consultative evaluations.  *Id*. § 404.1512(f).

## II.     The ALJ's Decision

In his decision, the ALJ found that plaintiff met the insured status requirements through

December 31, 2015, and at step one of the sequential evaluation, found plaintiff had not engaged

in substantial gainful activity. Tr. 16. Proceeding to step two, the ALJ found that plaintiff had the

following severe impairments which cause more than minimal functional limitations on his

ability to engage in basic work activities: "AIDS with myositis, bipolar disorder, anxiety disorder, borderline personality disorder, and attention deficit hyperactivity disorder (ADHD)." Based on the submitted medical records, the ALJ concluded that plaintiff had no severe pulmonary, cardiac, or alcohol abuse impairments. Tr. 16-17.

At step three, the ALJ found that plaintiff's impairments did not meet or medically equal the severity of any impairment in the Listing of Impairments. He then found that plaintiff had the residual functional capacity to perform medium work except that he was limited to simple, routine work. Tr. 17-24. Turning first to plaintiff's HIV/AIDS, the ALJ noted that it "has not resulted infections, malignant neoplasms, skin lesions, encephalopathy, wasting syndrome, diarrhea or other repeat manifestations of HIV infection." Tr. at 17. Next, the ALJ concluded that plaintiff's mental impairments singly and in combination did not meet the criteria of listings 12.04, 12.06 and 12.09, specifically referencing the "paragraph B" criteria and finding them not satisfied. The ALJ determined plaintiff had a "mild restriction" in the activities of daily living as "[h]e is able to manage his own activities of daily living without assistance." Tr. at 17. As to social functioning, plaintiff had mild difficulties based on his "frequently . . . meeting men and engaging in casual sex" and no other significant difficulties reported, outside of "some anxiety in dealing with customers in his current part-time job." Noting that mental status examinations support some deficits with regard to concentration, persistence or pace , the ALJ concluded plaintiff has moderate difficulties in that paragraph B criteria. Lastly, the ALJ noted that plaintiff had experienced no episodes of decompensation which have been of extended duration. Tr. 17. Turning then to the issue of residual functional capacity, the ALJ concluded that plaintiff has the

residual functional capacity to perform medium work except that he is limited to simple, routine work.

In assessing residual functional capacity, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that plaintiff's statement concerning the intensity, persistence and limiting effects were "not entirely credible." The ALJ noted that plaintiff's AIDS appears well controlled with medication. Focusing on plaintiff's complaints of fatigue, and insomnia and his subjective concern about wasting syndrome, the ALJ pointed to the absence of muscle tenderness, swelling or atrophy, good bilateral strength with average muscle tone, and normal physical examinations, and plaintiff's working out with a trainer. The ALJ concluded, based on these medical findings, that plaintiff remained capable of lifting and carrying up to 50 pounds occasionally and 25 pounds frequently, and standing, walking and sitting for six hours total in an eight hour work day. As to mental health, the ALJ found plaintiff's allegations of "severe anxiety with panic attacks [were] not supported by his treatment records showing improvement in his mood stability and anxiety levels with medication and therapy." Further, the allegations were contrary to what plaintiff reported at the consultative examination and were not reflected in his treatment records. Although acknowledging that plaintiff displayed some anxiety and deficiency in concentration, the ALJ noted his thought process remains coherent and he retained "adequate memory skills and was able to count and do simple calculations." While his anxiety and deficiencies in concentration warranted limiting plaintiff to simple, routine (i.e. unskilled) work, more restrictive limitations were "not adequately supported by his treatment records." Tr. 18-21.

The ALJ did not give the GAF score of 50 by plaintiff's providers at F.E.G.S. "significant weight" as that scale was dropped by the American Psychiatric Association because of "its conceptual lack of clarity" and "questionable psychometrics in routine practice." Tr. at 21. The ALJ also gave the February 2013 medical source statements "very little weight to the extent they impose more restrictive limitations than are reflected in the residual functional capacity assessment" as they were inconsistent with the treatment records showing stabilized mood and decreased anxiety with treatment, as well as plaintiff's ability to maintain activities of daily living and some social functioning, and his interaction with the public at his part-time position. Tr. at 22. Similarly, the assessments by Dr. Fuhrer were held to be of little value as they did not provided a function by function analysis of claimant's residual functional capacity. Tr. 23.

Addressing the consultative medical evidence, the ALJ did not credit the State Agency psychological consultant's opinion regarding additional restrictions in social functioning and dealing with stress but otherwise found that opinion and the opinion of the psychological consultative examiner consistent with limiting plaintiff to simple routine work. Similarly, the ALJ accepted the State Agency medical consultant's opinion with respect to plaintiff's ability to lift, stand, walk, sit, climb and crawl but found the limitations on exposure to fumes, odors, dust, and the like  not adequately supported by treatment records given the paucity of documentation of pulmonary complaints. The internal consultative examiner's opinion was given little weight as the terms used, i.e. mild and moderate, were not defined and are usually applied to mental, not physical, limitations. Tr. 22-23.

Finally, the May 2012 medical source statement of NP Ording-Bauer indicating that

plaintiff has marked limitations in social functioning and concentration, persistence or pace, was given little weight on the grounds that she is not an acceptable medical source as she "is not a mental health professional and does not treat [plaintiff] for his mental impairments," and the limitations are not supported by the objective treatment records. Tr. 24.

In sum, the ALJ found the stated residual capacity assessment was "supported by the objective treatment records and the opinions of the State Agency psychological consultant and the psychological consultative examiner."

Turning to plaintiff's ability to perform past relevant work, the ALJ noted that plaintiff's job as head housekeeper is skilled in nature. Given, however, plaintiff's testimony that he also performed full-time housekeeping duties, the ALJ determined that he was able to perform his past relevant work as cleaner/housekeeping as it is generally performed, work which is unskilled and generally performed at a light exertional level. Tr. 24. The ALJ therefore determined that plaintiff was not disabled.

## III.    Summary of Arguments

Plaintiff raises five arguments in support of remand.  He maintains that the ALJ's finding that he could perform medium work which would be limited to simple routine work is unsupported by the record. (Pl.'s Mem. at 14-15.) Further, the ALJ is said to have erred in giving little weight to the opinions of plaintiff's treating psychological sources and in failing to obtain the testimony of a vocational expert. (*Id.* at 15-17.) It is also claimed that the ALJ "inappropriately alluded to the plaintiff's sexual orientation in his decision" and erroneously concluded that his part-time work was evidence of non-disability.(*Id.* at 17-19.)

Defendant asserts that the Commissioner's decision is supported by substantial evidence and is based upon the correct legal standard. (Def.'s Mem. at 23-28; Def.'s Reply Mem. at 2-4.) It is also argued that the determination that the testimony of a vocational expert was not required was proper. (Def.'s Reply Mem. at 4.) Finally, defendant maintains that it was appropriate for the ALJ to refer to and evaluate plaintiff's social activities and to consider his part-time work. (*Id*. at 5.)

**IV.    Application of the Governing Law to the Present Facts**

After a careful review of the record in this case, the Court concludes that the ALJ's conclusions are supported by substantial evidence and he applied the correct legal standards. Like the parties, the Court will limit its discussion to steps three and four.

Plaintiff argues that the ALJ's determination that plaintiff could perform medium work is not supported by the evidence of record because it was based on the ALJ's "cherry-pick[ing]" of the psychiatric consultant's report. Specifically, it is claimed that the "ALJ fail[ed] to provide substantial evidence to support his rejection of Dr. Acer's assessment that plaintiff is restricted in social functioning and dealing with stress. (Pl.'s Mem. at 15.) However, an ALJ may credit those portions of a consultative examiner's opinion which the ALJ finds supported by substantial evidence of record and reject portions which are not so supported. *See Pelam v. Astrue*, 508 Fed. Appx. 87, 89 (2d Cir. 2013) ("substantial evidence supported the ALJ's decision not to adopt many of consultative examiner's conclusions"). Here, the evidence (1) that plaintiff was engaged in part-time work where he had to interact with the public, (2) he was able to travel and engage in other social activities, (3) was able to maintain activities of daily living, and (4) that he worked as

a residential cleaner provides substantial evidence for the ALJ's determination. Moreover, treatment notes showed that plaintiff had clear speech, appropriate motor activity, was alert and cooperative, related adequately and had good judgment; these findings support the ALJ's determination of plaintiff's residual functioning capacity. The opinion of Dr. Lopez that plaintiff could follow supervision, relate appropriately to coworkers, and perform gainful activity further support the ALJ's conclusion. It is well-settled that a consulting physician's opinion, viewed in conjunction with other elements of the record, can constitute substantial evidence supporting an ALJ's conclusions. *See, e.g., Rosier v. Colvin*, 586 Fed. Appx. 756, 758 (2d Cir. 2014) (substantial evidence supporting ALJ's conclusion that a treating physician's opinion should not be given controlling weight included evaluations by a consultative examiner); *Rivera v. Colvin*, 2015 WL 1027163 at *16 (S.D.N.Y. Mar. 9, 2015) ("It is not per se legal error for an ALJ to give greater weight to a consulting opinion than a treating opinion.").

Nor did the ALJ err in granting little weight to the opinions of plaintiff's treating psychological sources, who opined that plaintiff had mostly extreme and marked mental limitations. These opinion were, as discussed by the ALJ, inconsistent with plaintiff's treatment records which showed stabilized mood and decreased anxiety with treatment. *See, e.g., Rosier v. Colvin*, 586 Fed. Appx. at 758 (ALJ properly rejected treating physician's opinion where other substantial evidence in the record was inconsistent with treating physician's opinion); *see also Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004) ("Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, ... the opinion of the treating physician is not afforded controlling weight where, as here, the treating

physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir.1993) (noting that the regulations "permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record"); *Punch v. Barnhart*, 2002 WL 1033543, at *11–13 (S.D.N.Y. May 21, 2002) (where ALJ credited the opinion of a non-treating medical expert over that of a treating physician for the stated reasons that the treating physician's opinion was "not well supported by medically acceptable clinical and laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence" in the record, the ALJ was "following the treating physician regulation rather than ignoring it," as the plaintiff claimed). Moreover, the ALJ's determination limiting plaintiff to simple routine work was consistent with Dr. Chuang's and SW Ruiz's medical source statement of February 2013 to the extent they opined plaintiff's ability to perform complex, varied tasks was extremely limited but his ability to perform activities within a schedule, respond appropriately to co-workers and perform simple tasks was only moderately limited. Plaintiff's reliance upon the March 2013 report of a recent manic episode as evidence that his condition had not stabilized, (Pl.'s Mem. at 16.), does not change this result as treatment notes reveal that plaintiff had come off his medications at that time. Nor was it error for the ALJ to not give the GAF score of 50 by plaintiff's providers at F.E.G.S. "significant weight." As noted by the ALJ that scale was dropped by the American Psychiatric Association because of "its conceptual lack of clarity" and "questionable psychometrics in routine practice." Tr. at 21. Additionally, that score was ascribed to plaintiffs by Dr. Chuang and SW Ruiz's at their first interaction with plaintiff and not after the

improvement shown by treatment.[2]

Plaintiff contends that the ALJ inappropriately alluded to plaintiff's sexual orientation. He is correct that a claimant's sexual orientation is irrelevant. However, the record evidence that plaintiff was dating, socializing with others, and traveling was appropriately relied upon in determining whether plaintiff was disabled because he was limited in his social functioning. Under the guidelines for assessing the intensity, persistence, and limiting effects of a mental impairment, an ALJ is required to consider "all the available evidence." *Whipple v. Astrue*, 479 Fed. Appx 367, 370 (2d Cir. 2012) (citing 20 C.F.R. § 404.1529(c)(1), (4)).

Nor was the ALJ's consideration of plaintiff's part-time work erroneous. Although "a claimant need not be an invalid to be found disabled under the Social Security Act," *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotations and citation omitted), an ALJ may properly consider a claimant's daily activities - which would include part-time employment - in evaluating the extent to which his symptoms interfere with his ability to work. *See* 20 C.F.R. §§ 404.1529(c)(3)(I), 416.929(c)(3)(I); *Whipple v. Astrue*, 479 Fed. Appx at 370-71 (ALJ properly considered claimant's description of his daily living and seven month employment as a truck

_____

[2] In arguing that SW Ruiz's opinion should have been greater weight, plaintiff references SSR 06-3p which states that under certain circumstances "non-medical sources" such as therapists may "properly be determined to outweigh the opinion from a medical source."  (Pl.'s Mem. at 16.) To the extent that plaintiff is suggesting that the ALJ discounted SW Ruiz's opinion because he is a non-medical source, the Court finds nothing in the ALJ's decision to support that assertion. While the ALJ discounted the opinion of NP Ording-Bauer for multiple reasons, including that " a nurse practitioner is not an acceptable medical source" and NP Ording-Bauer "is not a mental health professional and does not treat plaintiff for his mental impairment (Tr. 24)," he did not discount SW Ruiz's opinion as a non-acceptable medical source. Rather, he gave little weight to SW Ruiz's opinion as it was inconsistent with treatment records. Tr. at 22.

driver in assessing the intensity, persistence and limiting effects of claimant's mental impairments).

Finally, there was no error in failing to obtain the testimony of a vocational expert. "[C]laimant has the burden to demonstrate an inability to return to h[is] previous specific job and an inability to perform his past relevant work generally." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis omitted). This "requires separate evaluations of the previous specific job and the job as it is generally performed." *Id.* Although an expert may be called to explain the requirements of a particular job, step four does not require that an expert be consulted. *Petrie v. Astrue*, 412 Fed. Appx. 401, 409 (2d Cir. 2011). Here, while plaintiff testified that his position as head housekeeper required him to order supplies and supervise other workers, tasks he "would have to squeeze in," he also testified that in a forty hour work week he spent forty hours "actually physically engaged in cleaning rooms" - "it was non-stop." Tr. 35. Thus, housekeeping duties - as opposed to head housekeeper - were correctly considered past relevant work generally. *See Petrie*, 412 Fed. Appx. at 409-410 (no error where claimant's submission confirm that his previous work duties are substantially the same as the unskilled duties of a kitchen helper or cook helper). Such duties are considered unskilled and performed at the light exertional level. The ALJ's determination that plaintiff could perform such duties was supported by substantial evidence, viz. that plaintiff had clear speech, appropriate motor activity, related adequately, had fair insight and good judgment and was cooperative.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is granted

and plaintiff's cross-motion is denied. The Clerk of Court is directed to enter judgment in favor

of defendant and to close this case.

Dated: Central Islip, New York
     August 17, 2016                             /s/  Denis R. Hurley       
                                        Denis R. Hurley
                                        United States District Judge